**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| **June Hall, on behalf of herself and all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **CASE NO. 1:22-cv-03795-MHC** |
| **v.** | ) ) | |
| **Xanadu Marketing, Inc. d/b/a Houses Into Homes** | ) ) ) | |
| **Defendant.** | ) ) ) ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS AMENDED COUNTERCLAIMS

## I.     INTRODUCTION

Plaintiff's Motion to Dismiss Defendant's Amended Counterclaims ("Motion") does not establish that any of Xanadu Marketing, Inc.'s ("Xanadu") counterclaims fail. To the contrary, taking the facts as alleged in the Amended Counterclaims as true, as the Court must at this stage, Xanadu more than adequately pleads all elements of its claims for fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of O.C.G.A. § 13-6-11.

The Amended Counterclaims establish that Plaintiff submitted multiple requests for marketing information ("Lead Forms")—two of which under a fake name—to a website affiliated with Xanadu. This led Xanadu's affiliate to call Plaintiff, and Plaintiff used these calls she requested to bring (meritless) claims against Xanadu under the TCPA. After Xanadu confronted Plaintiff, showing her the multiple, fraudulent Lead Forms, she dropped most of her claims, leaving only one (also meritless) claim for alleged hyper-technical non-compliance with the TCPA's seller-identification provisions. Through this claim, Plaintiff insists that Xanadu is liable for the very same calls that she elicited through deceptive means so she could file a class action.

In her Motion, Plaintiff repeatedly points to facts outside of the Amended Counterclaims and her own version of the facts (both of which may not be considered on a motion to dismiss), claiming Xanadu cannot allege liability because Plaintiff only lied to one of Xanadu's affiliates and not Xanadu. Plaintiff further claims that the alleged liability would defeat the purpose of the TCPA, brazenly suggesting that it was her right to submit fraudulent Lead Forms and manufacture TCPA liability. Numerous courts have held otherwise, refusing to dismiss counterclaims with less detailed facts than Defendant alleges in the Amended Counterclaims.

Pursuant to its obligation to limit its review to the Amended Counterclaims and accept those pleadings as true, the Court must deny the Motion. Xanadu more than

adequately alleges the "who, what, when, where, and how" of Plaintiff's fraud, as required by Rule 9(b).  Moreover, Xanadu has alleged a plausible breach of contract claim.  Specifically, by submitting two Lead Forms with false names to obtain Xanadu's real estate services, Plaintiff breached the Lead Form terms providing that she was "grant[ing] *my* consent" causing both direct and actionable remote damages in responding to Plaintiff's deception (or, alternatively, nominal damages permitted under Georgia law).  And, finally, Xanadu adequately pleads a claim for attorneys' fees under the standalone Georgia attorneys' fee statute, O.C.G.A. § 13-6-11.  Accordingly, the Court must deny the Motion in its entirety.

## II.    FACTS

In the Amended Counterclaims, Xanadu alleges that Plaintiff is a serial TCPA complainant who boasts on Facebook about multiple settlement checks she's received. Am. Counterclaims ¶ 7.  In an attempt to manufacture a TCPA claim against Xanadu, on February 10, 2022, Plaintiff visited a Xanadu-affiliated website, https://renttoownhomefinder.com.  *Id.* ¶¶ 8-9.  Once there, Plaintiff filled out multiple Lead Forms, allowing Xanadu and its affiliates, including Houses Into Homes, Inc. ("HIH"), to contact her phone number regarding real estate services.  *Id.* ¶¶ 9, 11, 15, 16. Those Lead Forms specifically provided that Plaintiff was "grant[ing] *my* consent" to

Xanadu and its affiliates "to contact me[.]"  *Id.* ¶ 12.[1]  However, Plaintiff submitted multiple Lead Forms and rather than using her own name, she used the name "Ollie Austin Mathis."  Am. Counterclaims ¶¶ 9, 15.

Having no reason to suspect Plaintiff's subterfuge, Xanadu sent all three Lead Forms to its affiliate, HIH.  *Id.* ¶ 20.  On February 10, 2022, HIH texted Plaintiff about its mortgage services.  *Id.* ¶ 22.  Though Plaintiff responded "STOP" to the first text, Plaintiff's submission of additional Lead Forms and her use of a different name gave Xanadu and its affiliates additional consent and caused them to send text messages to Plaintiff's phone number, relying on the belief that they were texting a different person who had given consent.  *Id.* ¶¶ 23-26.  Accordingly, Xanadu sent Plaintiff's phone number additional text messages after she responded "STOP."  *Id.*

---

[1] In the Motion, Plaintiff asks the Court to take judicial notice of an *unauthenticated* screenshot (the "Screenshot"), allegedly depicting Xanadu's website.  (Motion at 4 n.2). Plaintiff claims the image depicted in the Screenshot is referenced in the Counterclaim. (Motion at 4 n.2.)  The link referenced in the Counterclaim, however, does not lead to a webpage matching what is depicted in the Screenshot.  Am. Counterclaim ¶ 9.  And, *Moore v. Trader Joe's Co.*, a non-precedential case Plaintiff cites, specifically limited judicial notice to the "portion of the . . . website cited in the [complaint]."  2019 WL 2579219, at *3 (N.D. Cal. June 24, 2019).  Thus, because the Screenshot does not match the portion of the webpage referenced in the pleadings, judicial notice is improper, even under *Moore*.  More importantly, however, courts in this District have refused to take judicial notice of private websites, much less an unauthenticated screenshot.  *Piccard v. Deedy*, 2022 WL 832425, at *2 (N.D. Ga. Mar. 21, 2022).  Accordingly, the Court should deny Plaintiff's request for judicial notice and ignore the attached screenshot.

Having received multiple texts to her phone number after responding "STOP," Plaintiff's trap was sprung: in her mind at least, she could now entrap Xanadu and its affiliates into meritless allegations of TCPA liability. *Id.* ¶ 27. Plaintiff proceeded to file this TCPA class action against Xanadu, alleging liability for sending unsolicited texts to a National Do Not Call registrant, not maintaining internal do not call policies, and failing to comply with the TCPA regulations' seller-identification provisions (despite the fact that HIH immediately identified itself after she texted "STOP"). *Id.* ¶ 32. When Xanadu confronted Plaintiff about her scheme, however, she amended her complaint, dropping all but the seller-identification count. *Id.* ¶ 34-35. Nevertheless, Plaintiff continues to pursue liability against Xanadu for calls that neither it nor its affiliates would have placed but for Plaintiff's scheme. *Id.* ¶¶ 19-26. And Xanadu has and continues to incur expenses and interruption defending her claims. *Id.* ¶¶ 33, 35, 43.

## III.    ARGUMENT

### A.    Legal Standard.

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only contain "a short and plain statement of the claim that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court must accept all facts in the complaint as true and draw all reasonable inferences in favor of the complainant. *McGinley v. Houston*, 361 F.3d 1328, 1330 (11th Cir. 2004). The complaint only needs to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). A complaint meets that standard when it contains sufficient facts "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating a motion to dismiss under Rule 12(b)(6), the Court cannot consider matters outside of the pleading. *Jones v. Auto. Ins. Co. of Hartford, Conn.*, 917 F.2d 1528, 1532 (11th Cir. 1990).

When a claim involves fraud, the plaintiff must satisfy the heightened pleading standard under Rule 9(b). A plaintiff can meet that standard by stating:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (plaintiff must allege the "who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent.").

As discussed below, while Plaintiff attempts to muddy the waters by referencing facts outside the Amended Counterclaims, Xanadu has plausibly alleged liability against Plaintiff for each of its counterclaims.

### B.    Xanadu Plausibly Alleges Every Element of a Fraud Claim.

#### 1.    Xanadu Alleges Justifiable Reliance.

Plaintiff first argues that because HIH, a Xanadu affiliate, sent the messages, Xanadu cannot allege justifiable reliance. Motion at 7-9. Plaintiff repeatedly references Xanadu's argument in its Amended Motion to Dismiss that Plaintiff sued the wrong entity in her Amended Complaint and thus hasn't suffered an injury traceable to Xanadu for standing purposes.[2] *Id.* at 8.

But Plaintiff cannot have her cake and eat it too: asking the Court to find HIH and Xanadu as separate for the purpose of Xanadu's Counterclaims, while also to find that her injury is traceable to Xanadu for the purposes of her own claim. And Xanadu's statement is consistent with the Amended Counterclaim—that Xanadu and HIH are separate entities does not preclude the possibility that the two have a relationship, and that Plaintiff is suing Xanadu for HIH's conduct. Further, as facts outside the Counterclaim, Xanadu's statements are not properly before the Court on a Rule 12(b)(6) motion to dismiss. *Jones*, 917 F.2d at 1532.

---

[2] Ironically, Plaintiff opens the Motion by complaining about Xanadu referencing her original Complaint in its own pleadings, essentially asking the Court to strike those facts. Motion at 5-6. According to Plaintiff, the mere mention of the original Complaint in Xanadu's pleadings runs afoul of Rule 15. *Id.* This is nonsense—Rule 15's liberal amendment policy isn't a time machine. While the amended pleadings control *Plaintiff's claims*, Xanadu is free to use Plaintiff's statements in the original Complaint. *Healthier Choices Mgmt. Corp. v. Philip Morris USA, Inc.*, 2021 WL 6014854, at *4 (N.D. Ga. Dec. 3, 2021) (prior pleadings remain "competent . . . evidence."). And, standing alone, the Court must take all the allegations in Xanadu's counterclaims *as true* for purposes of a Motion to Dismiss, including any allegations relating to Plaintiff's Complaint.

Setting that aside, in the Amended Counterclaims, Xanadu alleges at least two facts establishing its reliance on Plaintiff's misrepresentations: (1) Xanadu's reliance on the Lead Forms, which falsely purported to inquire about Xanadu's services, when it submitted those forms to its affiliate, HIH; and (2) HIH's reliance on the false Lead Forms when it continued to text Plaintiff after she responded "STOP." Am. Counterclaims ¶¶ 9, 20, 23, 25, 32.

First, Xanadu alleges its *own* reliance. More specifically, Xanadu alleges it relied on the information Plaintiff provided in her false Lead Forms to convey the Lead Forms to HIH. Am. Counterclaims ¶ 20. Xanadu would not have supplied those Lead Forms to HIH, causing HIH to text Plaintiff after she responded "STOP," had Plaintiff not submitted multiple Lead Forms that falsely stated she wanted and consented to communications. This reliance directly caused damage to Xanadu.

Second, though Plaintiff claims Xanadu can't use HIH's reliance to support its own claim, this is incorrect. Xanadu alleges it has a relationship with HIH and that Xanadu is now being sued for HIH's calls. *Id.* ¶¶ 20, 32. When Plaintiff submitted the false Lead Forms, she knew—by virtue of the express language in the clickwrap agreement naming both Xanadu and HIH—that *both* would rely on her false statement and thus she may be liable for both Xanadu and HIH's reliance. *See Swyters v. Motorola Emps. Credit Union*, 535 S.E.2d 508, 510 (Ga. Ct. App. 2000) (persons are presumed to

have read and understood agreements they signed); *Badische Corp. v. Caylor*, 356 S.E.2d 198 (Ga. 1987) (plaintiff may be liable to third parties for a misrepresentation when she is aware the information she provides will be used by those parties). Thus, both Xanadu *and* HIH's reliance on Plaintiff's misrepresentations support the reliance element of Xanadu's fraud claim, as both caused Xanadu damages.[3]

*Hastings v. SmartMatch Ins. Agency, LLC*, 2022 WL 4002625, at *6 (E.D. Ark. Sept. 1, 2022) is inapposite. There, the defendant failed to allege that it had *any* relationship with the party that called the plaintiff. *Id.* ("It is not clear from the Counterclaim whether the unidentified company had any relationship with SmartMatch."). As such, the court concluded that because the defendant alleged plaintiff "was called by a third party that SmartMatch does not control," it didn't allege that the damages it suffered defending the litigation were the result of Plaintiff's misrepresentation.

---

[3] Notably, if the Court holds otherwise, it ***must*** dismiss Plaintiff's Amended Complaint. As Plaintiff points out (albeit improperly), Xanadu's pending motion challenges whether Plaintiff has standing to support this Court's subject matter jurisdiction. (ECF No. 25 at 15.) Xanadu's evidence (permitted by Rule 12(h)(3)) shows Plaintiff's injury, if traceable to anyone other than herself, is traceable to HIH–a third party not before the Court. (*Id.*) Thus, if the Court finds that Xanadu fails to allege reliance because HIH is a separate entity, the Court ***must certainly*** also find that Plaintiff's injury is not traceable to Xanadu.

Unlike *Hastings*, however, Xanadu alleges *its own* reliance on Plaintiff's false Lead Forms, which led Xanadu to supply that information to its affiliates. Am. Counterclaims ¶ 20. And, beyond its own reliance, Xanadu clearly alleges a relationship with HIH: that it is a corporate affiliate listed on a Xanadu-owned website, a co-party to the clickwrap agreement, and the entity to which Xanadu supplied the lead information. Am. Counterclaims ¶¶ 9, 13, 20. As other courts have acknowledged, where such a relationship exists, the defendant may use a third-party's reliance to support its own fraud claim. *See Anthony v. Fed. Sav. Bank*, 2022 WL 972305, at *5 (N.D. Ill. Mar. 30, 2022) (bank's allegation that its vendor called plaintiff in reliance on his false lead supported bank's counterclaim for fraud against plaintiff); *Franklin v. Upland Software, Inc.*, 2019 WL 433650, at *4 (W.D. Tex. Feb. 1, 2019) (refusing to dismiss counterclaim alleging plaintiff submitted false lead forms causing defendant's third-party vendors to call his phone number).

Xanadu also alleges that it was *directly* injured by HIH's reliance on Plaintiff's misrepresentations, which itself satisfies the reliance element of the fraud claim. *See S. Intermodal Logistics, Inc. v. D.J. Powers Co.*, 10 F. Supp. 2d 1337, 1355 (S.D. Ga. 1998) ("The whole point of the misrepresentations to K–Mart, SIL contends, was to harm SIL. This is enough for SIL to show proximate cause[.]"); *see also Mid Atl. Framing, LLC v. Varish Const., Inc.*, 117 F. Supp. 3d 145, 154 (N.D.N.Y. 2015) ("In fact, the Restatement

(Second) of Torts specifically recognizes a cause of action in favor of the injured party where the defendant defrauds another for the purpose of causing pecuniary harm to a third person.") (internal quotations omitted).

Plaintiff further argues that Xanadu has not alleged any action that was the result of Plaintiff's fraud, other than defending against the litigation. Motion at 9. This is false. Xanadu alleges that the only reason HIH, Xanadu's affiliate, texted plaintiff after she texted "STOP" was her submission of multiple Lead Forms on Xanadu's website *and* her using a false name. Am. Counterclaims ¶¶ 23, 25. Had Plaintiff not submitted multiple, false Lead Forms, HIH would not have continued to text her after she responded "STOP."[4] *Id.* ¶¶ 23, 25, 27.

### 2.    Xanadu Was Directly Harmed by Plaintiff's Fraud.

Plaintiff next argues that Xanadu did not allege any harm. Plaintiff first claims that Xanadu has not incurred any attorney's fees defending against liability arising from her fraudulent lead submissions because Xanadu waited to retain counsel until after Plaintiff filed her Amended Complaint. Motion at 11-12. Once again, this argument has

---

[4] Plaintiff proceeds to suggest that Xanadu is alleging Plaintiff's fraud was that "Plaintiff did not really want to receive messages," which he then argues does not amount to actionable fraud. Motion at 10. While that is certainly part of Plaintiff's fraud, her fraud was also submitting multiple Lead Forms and using fake names (despite purporting to "grant [her] consent.").

no basis in the allegations contained within the Amended Counterclaim and is thus outside the scope of the court's consideration for purposes of Plaintiff's Rule 12(b)(6) motion. *Jones*, 917 F.2d at 1532.

More importantly, however, is that Plaintiff appears to believe that Xanadu's alleged damages stop after she filed her Amended Complaint. Nothing in the Amended Counterclaims supports that belief. The damages Xanadu suffered responding to Plaintiff's litigation are not limited to a specific pleading. Am. Counterclaims ¶ 43 (damages "responding to Ms. Hall's allegations and defending against her frivolous and fraudulent claims."). That Plaintiff changed her pleadings after her scheme was discovered is irrelevant because she continues to allege technical liability for the very same calls that she requested. *Id.* ¶¶ 33-35. Those allegations have caused Xanadu's damages, including, as explained below, both the cost of hiring counsel to defend against Plaintiff's claims, along with the loss of its employees' time and interruption.

### i.    *Attorney's Fees*

Plaintiff further claims that damages incurred defending a claim arising out of her fraudulent submission of multiple false Lead Forms are not recoverable as a matter of law. Motion at 12. Though Plaintiff frames this as a question of damages, it is actually a question of proximate cause: whether Plaintiff's submission of false Lead Forms caused Xanadu to incur damages defending the action Plaintiff brought, arising from the calls

she requested. Questions of proximate cause are almost always inappropriate for a motion on the pleadings. *Coates v. Lyft, Inc.*, 2023 WL 181085, at *5 (N.D. Ga. Jan. 12, 2023); *see also Navient Sols., LLC v. L. Offs. of Jeffrey Lohman*, 2020 WL 1867939, at *4 (E.D. Va. Apr. 14, 2020) (whether damages were caused by defendant's manufactured TCPA claims could not be resolved on a motion to dismiss).

Further, Georgia law provides that damages that would otherwise be too remote to be the legal or natural cause are indeed recoverable when the defendant acted "knowingly for the purpose of bringing about the injury[.]" O.C.G.A. § 51-12-10; *Hodge v. Dixon*, 167 S.E.2d 377, 377 (Ga. Ct. App. 1969). Here, Xanadu alleges that Plaintiff submitted multiple false Lead Forms with the *intent* of manufacturing a TCPA claim against Xanadu. Am. Counterclaims ¶ 27. As Plaintiff is alleged to have intended to manufacture a claim against Xanadu, she knew and intended the damages Xanadu has incurred defending against that claim. *Id.* ¶¶ 33-35; *see also McGinnis v. Am. Home Mortg. Servicing Inc.*, 240 F. Supp. 3d 1337, 1349 (M.D. Ga. 2017) (specific intent to harm includes "evidence that the defendant knew it would certainly (or almost certainly) cause harm to the plaintiff."). Thus, even if the damages Xanadu suffered are otherwise remote, they are still recoverable.

The cases on which Plaintiff relies are inapposite as they all involved false statements that were made within the litigation itself, rather than, as here, false statements

leading the defendant to act in a manner that then becomes the source of plaintiff's litigation. The latter involves an element of reliance that is absent from the former. In *Chevron Corp. v. Donziger*, 2013 WL 3879702, at *4 (S.D.N.Y. July 29, 2013), for example, the fraud giving rise to plaintiff expending attorney's fees was the misrepresentations defendant allegedly made "in lawsuits brought against Mr. Dozinger[.]" And because plaintiff was aware of the falsity of those allegations ***at the time of the alleged fraud***, he failed to allege he incurred those costs because "he was deceived by and relied on" the false statements. *Id.*

Similarly, in *Barnes v. White County Bank*, 318 S.E.2d 74 (Ga. 1984), the plaintiff sued his bank after it cashed a cashier's check to the wrong person. *Id.* at 75. The bank's counterclaim alleged fraud based on plaintiff filing suit despite being "aware that the proceeds of the check had been disbursed properly." *Id.* Thus, like *Dozinger*, the fraud giving rise to the counterclaim was filing the suit itself. *Id.* The *Barnes* court held that the damages incurred defending against plaintiff's claims were thus not recoverable because they were "unrelated to any fraud allegedly perpetrated by appellant *prior to the filing of his complaint*[.]" *Id.* at 76 (emphasis added).

Finally, *U.S. Equal Emp. Opportunity Comm'n v. SleeveCo, Inc.*, 2008 WL 11334159 (N.D. Ga. Dec. 8, 2008) involved plaintiff's discrimination and retaliation action. The defendants alleged that the statements in plaintiff's "complaint to the EEOC

and in her complaint herein," were "materially false and known to be false by the Plaintiff when she made the statements." *Id.* at *6. Again, rather than holding that fraud can never proximately cause a party to incur attorney's fees or other expenses defending against litigation, the court held that defendant failed to identify the statements it relied on and how those statements led to its damages. *Id.*

Unlike *Dozinger*, *Barnes*, and *SleeveCo*, Xanadu's claims do not arise solely out of Plaintiff's filing suit. Rather, it was submitting multiple false Lead Forms to a Xanadu-owned website, which caused Xanadu's affiliate to message Plaintiff's phone number after she responded "STOP," an action which she then used to file suit, resulting in Xanadu's damages. Am. Counterclaims ¶¶ 23, 25, 27, 31, 33. Thus, there is an element of reliance—Xanadu's belief the Lead Forms were valid and HIH's belief it was contacting someone who consented (and someone other than Plaintiff for its second and third texts)—which was absent in *Dozinger*, *Barnes*, and *SleeveCo*. That Xanadu incurred these damages after it became aware of Plaintiff's fraud is immaterial because by that time, it was too late to do anything about it: Plaintiff already sprung her fraudulent trap. Xanadu is entitled to recover the damages it subsequently suffered as a result of Plaintiff's fraud.

ii.    *Employee Time and Interruption.*

Plaintiff further claims that the time Xanadu's employees spent responding to her fraud is not alleged with sufficient specificity so those damages are not recoverable as a matter of law.  Motion at 12-13.  These damages include the time responding to Plaintiff's false Lead Forms and the time responding to Plaintiff's claims and the instant litigation, which, as discovery will show, harmed Defendant's business.  Am. Counterclaim ¶¶ 20, 23-25, 31, 33, 49.  Again, as Plaintiff intended to cause those damages, they are recoverable.  O.C.G.A. § 51-12-10 (when defendant acts "with knowledge and for the purpose of depriving plaintiff of certain contemplated benefits," remote damages are recoverable).[5]

Other courts have found allegations similar to Xanadu's claim for lost employee time are sufficient to support a fraud claim.  For example, in *Upland Software*, 2019 WL 433650, a TCPA case, the court found the "employee time and resources to fulfill its contractual obligations" to have its vendors contact plaintiff "based on [his] representations" was a plausible injury.  *See also Cunningham v. USA Auto Prot., LLC*, 2021 WL 434243, at *3 (E.D. Tex. Jan. 8, 2021) ("[C]osts for employee time and resources" sufficient to support counterclaimant's fraud claim, alleging plaintiff

---

[5] Plaintiff further claims that Xanadu fails to satisfy *Salcedo v. Hanna*, 936 F.3d 1162, 1168 (11th Cir. 2019) by setting forth a specific amount of lost time.  However, *Salcedo* involved a challenge to standing, and was not a statement about the facts needed to plausibly allege liability.

manufactured TCPA claim); *Anthony*, 2022 WL 972305 (lost "employee time in talking with Anthony and soliciting him for a mortgage product," alleged a plausible injury for counterclaimant's fraud claim).

*Atkinson v. Pro Custom Solar LLC*, 2022 WL 4071998, at *3 (W.D. Tex. Sept. 1, 2022) does not support dismissal. There, Pro Custom Solar affirmatively contacted plaintiff despite the fact that Atkinson never "made any request regarding solar panels." *Id.* at *2. Atkinson, wanting to identify the uninvited caller, responded by feigning interest, claiming she had been "looking into solar." After a series of calls, Atkinson eventually told Pro Custom Solar that she just wanted to identify the caller and wasn't interested in solar panels. *Id.* at *3. In response to Atkinson's TCPA claim, Pro Custom Solar sued for fraud, claiming Atkinson wasted its time by feigning interest after Atkinson called. The court granted Atkinson's motion for summary judgment, finding it was inappropriate for Pro Custom Solar to recover for the time it spent pitching solar panels. *Id.* at *10. The court explained that such damages were too remote to be recoverable. *Id.*

The facts in *Pro Custom Solar* are in stark contrast to those here. As an initial matter, *Pro Custom Solar* was a summary judgment motion, after the parties had time to take discovery. And unlike *Pro Custom Solar*, Xanadu's affiliate only called Plaintiff after she submitted false Lead Forms to Xanadu's website, claiming she was interested

in its services.  And again, because Plaintiff *intended* to waste Xanadu's time, Georgia law allows Xanadu to recover damages that might otherwise be too remote.  Thus, *Pro Custom Solar*'s finding, applying Texas law to an unsolicited call at the summary judgment stage, is inapplicable.

### 3.    The TCPA is Not a License for Plaintiff to Commit Fraud.

Plaintiff finally argues that even if she submitted multiple false Lead Forms, Xanadu still cannot allege liability because that would defeat the purpose of the TCPA. Motion at 15.  In Plaintiff's mind, the TCPA's intent to incentivize private enforcement extends so far as to encourage litigants to submit false information to trap businesses into (false) claims that they violated the TCPA.  Unsurprisingly, *Mey v. Castle L. Grp., PC*, 2020 WL 5648326, at *1 (N.D.W. Va. Sept. 22, 2020), on which Plaintiff relies, doesn't support such a dubious purpose.  Rather, the plaintiff in *Mey* submitted a credit card application, using her own information, to identify a company that *already* called her.  *Id.* at **1-2.  But, here, according to the allegations in the Amended Counterclaims (which is all this Court can consider on the motion to dismiss), Plaintiff was fully aware of who Xanadu was and provided Xanadu (and HIH) consent to contact her when she submitted her false Lead Forms.  Am. Counterclaims ¶¶ 9-13; *see also Swyters*, 535 S.E.2d at 510. Moreover, Xanadu would never have contacted Plaintiff but for her scheme.  Am. Counterclaims ¶¶ 19-26.  Thus, unlike *Mey*, this is not a case where Plaintiff was

(properly) attempting to identify someone who violated the TCPA by contacting her without consent; it is a case where someone gave consent based on fraud and then sued the party she gave consent to.

### C.     Xanadu States a Plausible Claim for Breach of Contract.

#### 1.     The Lead Form is an Enforceable Contract.

Plaintiff next argues that Xanadu's breach of contract claim fails.  Plaintiff first argues that Xanadu fails to allege consideration.  (Motion at 16-17).  To start, given this is a breach of contract action, Georgia law controls the presence or absence of consideration.  *Brooks v. Steadfast Servs., Inc.*, 2021 WL 5029424, at *3 (N.D. Ga. July 6, 2021).  Here, in exchange for allowing defendant to contact Plaintiff by telephone, Plaintiff obtained another avenue through which she could obtain Xanadu's real estate services, including its mortgage lending services.  Am. Counterclaim ¶ 46.  Those services are valid consideration under Georgia law and make the Lead Form enforceable. *Mayo v. Lynes*, 55 S.E.2d 174, 176 (Ga. Ct. App. 1949) (defendant's receipt of real estate services was sufficient consideration and made the listing agreement enforceable).

Plaintiff further maintains that Xanadu did not "allege that it assented to the terms of any 'contract.'"  Motion at 18.  That argument is borderline frivolous, as Xanadu prepared the terms of the agreement.  In *Kellogg v. Fannie's Inc.*, 2019 WL 13245096, at *3 (N.D. Ga. Jan. 11, 2019), on which Plaintiff relies, in contrast, the counter-plaintiff

employer alleged that it gave its employee a copy of its policies and that, by continuing to work at the dance club, the employee agreed to the terms of those policies. The court dismissed the breach of contract claim because, among other reasons, the employer failed to allege its employee agreed to be bound by the policies. *Id.* Again, unlike *Kellogg*, Xanadu wrote the policy and offered it to Plaintiff, which quite obviously evidences Xanadu's assent.

### 2.    Plaintiff Breached the Terms of the Lead Form.

Plaintiff further claims that Xanadu fails to allege a breach of contract. However, as the Amended Counterclaims clearly show, Plaintiff granted "*my* consent[.]" Am. Counterclaims ¶ 12.[6] Plaintiff plainly breached that term by attempting to consent on behalf of a third-party, namely "Ollie Austin Mathis."

This case is unlike *Karitanyi v. Seterus Inc.*, 2018 WL 1833013, at *3 (N.D. Ga. Feb. 5, 2018). There, Karitanyi sued a loan servicer, Seterus, after it foreclosed on her home, alleging that Seterus agreed to debit her account after her loan was assigned to Seterus from Chase. Dismissing her breach of contract claim, the Court found plaintiff failed to identify "with specificity the contract language upon which she relies, allegedly

---

[6] While not at issue for the purposes of assessing the sufficiency of the pleading, the Lead Form also instructed Plaintiff to "Enter *Your* Information Below." D.E. 27-2. Plaintiff's failure to enter her own information constitutes a breach of this term.

requiring Seterus to debit loan payments from a specific bank account when it took over plaintiff's loan. *Id.* (emphasis added).

In the instant case, on the other hand, Xanadu included all relevant contractual language on which it relies through a screenshot of the relevant terms in the Lead Form: "[Plaintiff] agree[s] and expressly grant[s] *my* consent" to Xanadu and its affiliates to contact her about their real estate services.  Am. Counterclaims ¶ 12.[7]

### 3.    Plaintiff's Breach Caused Xanadu's Damages.

Next, Plaintiff argues that Xanadu hasn't alleged it was harmed by Plaintiff's breach.  Motion at 19-20.  To that end, Plaintiff first argues that the loss of employee time both responding to Plaintiff's false lead and helping defend against her claims is not

---

[7] Even if some formal contractual requirements aren't met, the promise in Lead Form, "expressly grant[ing] my consent" to Xanadu and its affiliates to contact Plaintiff is still an enforceable promise through Xanadu's detrimental reliance. *Everts v. Century Supply Corp.*, 590 S.E.2d 199, 202 (Ga. Ct. App. 2003) ("Under Georgia law, promissory estoppel is a doctrine wherein consideration is supplied by the reliance of the promisee on the promise of another."); *see also* O.C.G.A. § 13-3-44.  Xanadu has alleged facts supporting its entitlement to relief under promissory estoppel.  Namely, (1) Plaintiff repeatedly promised that she was granting her consent to allow Xanadu and its affiliates to contact her; (2) Plaintiff made these promises with the intent of prompting Xanadu and its affiliates to send solicitation calls to her phone number; (3) Xanadu and its affiliates relied on those promises and contacted Plaintiff's phone number after she responded "STOP"; and (4) if the Court finds that the Lead Form is not an enforceable contract, the only way to prevent the injustice that would result from Plaintiff making promises to manufacture a TCPA claim would be to enforce Plaintiff's promises that she was granting her consent.  Am. Counterclaim ¶¶ 12, 20, 23-25, 27, 31; *Everts*, 590 S.E.2d at 202 (identifying the elements for a promissory estoppel claim).

traceable to her breaching the Lead Form by failing to provide her own consent. *Id.* at 20. Plaintiff further maintains that the Lead Form does not provide for these damages. *Id.* at 21.

However, as discussed above, O.C.G.A. § 51-12-10 allows for recovery of remote damages where, as here, Plaintiff had knowledge and purpose to deprive the other party of contemplated benefits when she "broke[ ]" the contract, and thus entitles Xanadu to recover damages that would otherwise be remote. As such, *Wausau Underwriters Ins. Co. v. Danfoss, LLC*, 2015 WL 9094201, at *15 (S.D. Fla. Dec. 16, 2015), which involved a contract controlled by New York law (which does not contain an analogous provision), is wholly inapplicable. Similarly, *McCabe v. Daimler Ag*, 2015 WL 11199196, at *6 (N.D. Ga. Aug. 19, 2015) did not involve a knowing and intentional breach and therefore did not address the propriety of attorney's fees and lost employee time under O.C.G.A. § 51-12-10. Because Xanadu alleges Plaintiff intentionally breached the Lead Form by submitting false information for the purpose of manufacturing a claim against Xanadu, she knew and intended the damages Xanadu has incurred both responding to her false lead and defending against her claim. Am. Counterclaims ¶¶ 27, 33-35. Remote damages are therefore permitted.

Furthermore, under Georgia law, even where a breach of contract results in no actual damages, Xanadu is still entitled to nominal damages. *See* O.C.G.A. § 13-6-6;

*Blok Indus. Inc. v. Sisloy LLC*, 2022 WL 16960358, at *6 (N.D. Ga. July 19, 2022) ("The possible recovery of nominal damages is sufficient to preclude summary judgment.").[8] Thus, for purposes of a motion to dismiss, Xanadu need not allege more than nominal damages.

Plaintiff further argues that Xanadu has not alleged a right to attorney's fees under O.C.G.A. § 13-6-11 through Plaintiff's breach of contract. Motion at 22. To that end, Plaintiff first baldly argues that Xanadu has abandoned its claim for those fees as a result of Plaintiff's "stubbornly litigious[ness]" and "unnecessary trouble and expense," by focusing on Plaintiff's bad faith. *Id.* at 22. That is false. As alleged in the Amended Counterclaims, after breaching the Lead Form, Plaintiff filed suit knowing her breach entrapped Xanadu into her own claims of liability. Am. Counterclaims ¶ 32. In fact, when Xanadu gave plaintiff proof of her breach, she dropped all but one claim (which still fails to state a claim). *Id.* ¶ 35. Accordingly, Xanadu alleges facts that could show the absence of a bona fide dispute, supporting its recovery of attorney's fees under the "stubbornly litigious" and "unnecessary trouble and expense" prongs of O.C.G.A. § 13-6-11, in addition to Plaintiff's "bad faith."

---

[8] Nominal damages may also underpin an award of attorney's fees under O.C.G.A. § 13-6-11. *Hayman v. Paulding Cnty.*, 825 S.E.2d 482, 487 (Ga. Ct. App. 2019).

Plaintiff's arguments regarding the "bad faith" prong likewise fail.  Initially, Plaintiff points out that she "promptly filed an amended complaint addressing the complained-of allegations[.]"  Motion at 23.  Yet, bad faith under O.C.G.A. § 13-6-11 involves the "conduct arising from the transaction underlying the cause of action being litigated, not conduct during the course of the litigation itself."  *David G. Brown, P.E., Inc. v. Kent*, 561 S.E.2d 89 (Ga. 2002).  Thus, the question is whether Plaintiff's **submission of multiple Lead Forms under different names** is a species of bad faith entitling Xanadu to attorney's fees, not the filing of the Class Action Complaint.  It is.  *Napier v. Kearney*, 855 S.E.2d 78, 83 (Ga. Ct. App. 2021) (explaining that fraud is a species of "bad faith" under O.C.G.A. 13-6-11).  That Plaintiff later amended her Complaint after she was found out does nothing to mitigate her initial bad faith.

Plaintiff further argues that such damages are barred by the doctrine of unclean hands (allegedly representing Plaintiff was approved for a loan she did not apply for).  Motion at 23.  Once again, Plaintiff bases this argument on facts outside of the Amended Counterclaims (*i.e.*, Plaintiff's application for and approval of a loan), so this is certainly not an issue that the Court can resolve at the pleading stage.  Moreover, she cites no authority that the *equitable* doctrine of clean hands bars Xanadu from pursuing its *statutory* rights, including its right to recover attorney's fees under O.C.G.A. § 13-6-11.  Thus, Xanadu clearly pleads a plausible claim for damages.

### D.    Xanadu Plausibly Alleges a Breach of an Implied Duty and Attorney's Fees.

Plaintiff's remaining arguments against Xanadu's implied duty claim and its claim for attorney's fees are entirely premised on Xanadu's position that Xanadu failed to state a breach of contract claim (and therefore no implied duty existed). Similarly, Plaintiff argues that without a breach of contract or fraud, there can be no liability for attorney's fees under O.C.G.A. § 13-6-11. But, as established above, Xanadu has plausibly alleged breach of contract and fraud claims. And because Xanadu alleges separate liability, whether through fraud or by contract, Xanadu is entitled to attorney's fees under O.C.G.A. § 13-6-11. *SRM Grp., Inc. v. Travelers Prop. Cas. Co. of Am.*, 841 S.E.2d 729, 731 (Ga. 2020) ("[A] plaintiff-in-counterclaim asserting an independent claim may seek, along with that claim, attorney fees and litigation expenses under O.C.G.A. § 13-6-11, regardless of whether the independent claim is permissive or compulsory.").

## IV.    CONCLUSION

In light of the foregoing, Xanadu has alleged plausible liability against Plaintiff arising from her fraudulent submission of multiple Lead Forms under different names. This states a claim for fraud and breach of contract and the Court should deny Plaintiff's Motion to Dismiss in its entirety.

Respectfully submitted this 21st day of February, 2023.

**KABAT CHAPMAN & OZMER LLP**

_/s/ Ryan D. Watstein_

Ryan D. Watstein
Georgia Bar Number 266019
rwatstein@kcozlaw.com
Joshua Y. Joel
Georgia Bar No. 230547
jjoel@kcozlaw.com
171 17th Street NW, Suite 1550
Atlanta, Georgia 30363
(404) 400-7300
(404) 400-7333 Fax

_Counsel for Xanadu_

**<u>CERTIFICATE OF COMPLIANCE</u>**

Undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in Local Rule 5.1.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that today, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan D. Watstein*
Counsel for Xanadu