UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| June Hall, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>Xanadu Marketing, Inc. d/b/a Houses Into Homes,<br><br>    Defendant. | Case No. 1:22-cv-03795-MHC |

**PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDER GRANTING DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

1

## Introduction and Background

Through its order granting Xanadu Marketing, Inc. d/b/a Houses Into Homes's ("Defendant") amended motion to dismiss June Hall's ("Plaintiff") claims under Rule 12(b)(1), the Court concluded that Plaintiff's allegations failed for lack of Article III standing. However, on July 24, 2023, the Eleventh Circuit, through a unanimous *en banc* decision, reversed its holding in *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), which held that the "receipt of a single text message" is not a concrete injury. *See Drazen v. Pinto*, No. 21-10199, 2023 U.S. App. LEXIS 18832 (11th Cir. July 24, 2023). In doing so, the Eleventh Circuit concluded that the receipt of even a single text message sent in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") causes a concrete injury sufficient to satisfy Article III standing, and in doing so, reversed course from *Salcedo* and its progeny.

Given this intervening change in law, Plaintiff submits that the Court should reconsider its ruling dismissing Plaintiff's claims for lack of Article III standing. The application of *Salcedo* and related decisions stemming from it dominated the parties' briefing regarding Plaintiff's standing to pursue claims against Defendant, and given that the Eleventh Circuit reversed course, Defendant's foundational argument is no longer valid. Thus, this Court should adopt the reasoning of the many other courts to consider the issue and find that Plaintiff is entitled to litigate her claims against

Defendant for its violations of 47 C.F.R. § 64.1200(d)(4) and 47 U.S.C. § 227(c)(5).

In addition to this significant change in the controlling precedent, Plaintiff also requests that the Court reconsider its ruling for two additional reasons: (1) it credited several factual arguments that Defendant *first* raised in its reply concerning Plaintiff's core allegations of harm—that "she spent several hours attempting to identify the entity responsible for sending the text messages at issue as well as additional time investigating ways to get Defendant to stop delivering the text messages"—which Defendant acknowledged it failed to address through its motion, *see* ECF No. 28 at 6 n.1, but the Court nevertheless credited through its order granting Defendant's motion; (2) recent actions by federal agencies, including the Federal Communications Commission ("FCC") and Federal Trade Commission ("FTC"), suggest that Defendant's practices of using unrelated entities to obtain telemarketing "consent" for dozens of third party partners is improper. Specifically, the FCC issued a notice of proposed rulemaking seeking comments on a potential ban on acquiring prior express written consent to receive telemarketing messages from entities unrelated to the subject matter of the entity seeking to obtain consent. *See Report and Order and Further Notice of Proposed Rulemaking - CG Docket Nos. 21-402 and 02-278,* FCC 23-21, at 24-25 (Mar. 17, 2023) (discussing "closing the lead generator loophole" by limited the ability of telemarketers to generate

3

"consent" for unrelated partner companies, like Defendant did here), attached as Exhibit A. Additionally the FTC has begun engaging in enforcement actions that indicate that it believes that attempting to obtain consent for 90 unrelated partner entities is invalid or improper for the purposes of obtaining prior express written consent, further suggesting that any consent Defendant contends it may have here may be legally—or factually—invalid. *See United States v. Viceroy Media Solutions, LLC*, Case No. 3:23-cv-3516, ECF No. 1 (N.D. Cal.), attached as Exhibit B ("Viceroy"). And this is further accentuated by the fact that Defendant failed to provide proof of prior express *written* consent, as required by the TCPA's implementing regulations for telemarketing messages such as those at issue here.

Given that the Eleventh Circuit has reversed course on its TCPA standing-related holdings to fall in line with the other circuits, that many of Defendant's standing-related arguments were largely *first* raised in its reply, and that the FTC (and FCC) are cracking down on conduct materially identical to Defendant's conduct here, this Court should reconsider its prior order dismissing Plaintiff's claims for lack of standing, and either find that Plaintiff satisfies the standard articulated in *Drazen*, or afford Plaintiff the opportunity to file a second amended complaint to align her allegations with the standard articulated in *Drazen*. *Accord Fields v. Locke Lord Bissell & Liddell LLP*, No. 1:07-CV-2984-TWT-CCH, 2008

U.S. Dist. LEXIS 127652, at *9 (N.D. Ga. July 31, 2008) (denying motion for reconsideration but granting leave to file amended complaint).

## Standard of Law

Motions for reconsideration, although not routine, *see* Local Rule 7.2(E), are appropriate when there is "(1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact." *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258-59 (N.D. Ga. 2003). Applying this standard, Plaintiff believes that an intervening change in controlling law warrants this Court's reconsideration of its order dismissing Plaintiff's claims for lack of Article III standing and, additionally, that the Court erred in crediting Defendant's arguments that it first raised in its reply.

Additionally, under Federal Rule of Civil Procedure Rule 15(a), a party may amend its complaint once as a matter of course within twenty-one days after service of a response by answer or motion. Because Plaintiff has already done so, she instead may amend her complaint "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15(a) further instructs that "[t]he court should freely give leave when justice so requires." *Id.* "[U]nless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988).

**Argument**

I. **An Intervening Change in Controlling Law Warrants Reconsideration of the Order Granting Defendant's Motion to Dismiss.**

Through its *second amended* motion to dismiss, Defendant focused its standing-related argument on the Eleventh Circuit's holding "that the receipt of unwanted text messages alone does not establish Article III standing." ECF No. 25 at 11 (citing *Salcedo*); *see also id.* at 13-14. In responding to Defendant's motion, Plaintiff too focused heavily on the impact of *Salcedo* on her allegations, *see* ECF No. 26 at 10-13. And, through its reply, Defendant again heavily focused on the impact of *Salcedo*. *See* ECF No. 28 at 6, 7, 9-10. As a result, *Salcedo* and its progeny weighed heavily on the determination of Plaintiff's Article III standing to pursue her claims.

Notably, then, on July 24, 2023, the Eleventh Circuit issued its unanimous *en banc* opinion in *Drazen*, through which it rejected *Salcedo* and reversed course on its outlier interpretation of TCPA standing, finding that the receipt of unlawful text messages sent in violation of the TCPA was sufficient to state a concrete harm and satisfies Article III standing requirements. *See generally Drazen*, 2023 U.S. App. LEXIS 18832. More specifically, the Eleventh Circuit ruled that the delivery of these text messages comports with the "common-law claim of intrusion upon seclusion" and that "[a] plaintiff who receives an unwanted, illegal text message suffers a

6

concrete injury." *Id.* at *4. In rejecting its prior decision in *Salcedo*, the Eleventh Circuit joined every other Circuit to address the issue, and further acknowledged that "'Congress may elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.' And Congress's power to elevate harms to the status of legally cognizable injuries 'implies that the level of harm required at common law does not stake out the limits of [its] power to identify harms deserving a remedy.'" *Id.* at *14-15.

Plaintiff, through her complaint, alleges that Defendant's conduct harmed her because "she suffered an invasion of privacy, an intrusion into her life, and a private nuisance." ECF No. 4 at ¶ 27. *Drazen* specifically held that "the harm associated with an unwanted text message shares a close relationship with the harm underlying the tort of intrusion upon seclusion," rendering Plaintiff's allegations sufficient for Article III standing. 2023 U.S. App. LEXIS 18832, at *17-18. Relevant, then, is that Plaintiff is entitled to recover only once per call under 47 U.S.C. § 227(c)(5) for Defendant's alleged violations of 47 C.F.R. § 64.1200(d). *See, e.g.*, *Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 631 n.7 (6th Cir. 2009) (noting that § 227(c)(5) violations may only be awarded per call, rather than per violation). Plaintiff alleged that Defendant violated § 64.1200(d)(4) by failing to disclose required identifying information for telemarketers, among other things. *See generally* ECF No. 4. Thus,

to the extent that Defendant suggests that *Drazen* is only applicable if Plaintiff also separately alleges a lack of prior express written consent in order to pursue claims under § 64.1200(d)(4), that would impose new hurdles to those claims and render all of § 64.1200(d) superfluous, given that the delivery of telemarketing calls without prior express written consent is—independently—a violation of § 227(c)(5) and § 64.1200, and Plaintiff could not additionally recover for that parallel violation. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("courts should disfavor interpretations of statutes that render language superfluous."). Imposing such a requirement would essentially rewrite § 64.1200(d) out of existence.

Moreover, Plaintiff also alleges that, because of Defendant's deliberate decision to omit required disclosures in its telemarketing messages, and instead falsely represent that Plaintiff applied for and was awaiting approval for a loan she never applied for—and Defendant's self-serving declaration did not contend otherwise—she wasted additional time attempting to "identify the entity responsible for sending the text messages at issue as well as additional time investigating ways to get Defendant to stop delivering the text messages." ECF No. 4 at ¶ 63. These allegations also suffice under the standard articulated in *Drazen*.

To the extent that Defendant contends that Plaintiff's allegations remain sufficiently far-removed from the specific allegations addressed in *Drazen*, such that

it contends that her allegations are not sufficiently aligned with the common law tort of intrusion upon seclusion—despite Plaintiff alleging that in her complaint, *see id.* at ¶ 27—the Court should grant Plaintiff leave to file an amended complaint to properly align her allegations with the standard articulated in *Drazen*.[1] If Plaintiff is afforded the opportunity to do so, she can explain and allege how Defendant's conduct also aligns with other common law torts—such as negligent or fraudulent misrepresentation—because Defendant intentionally delivered deceptive communications falsely implying that Plaintiff applied for or received a loan, for the purposes of persuading her to visit the links attached to the subject text messages: http://another-step.xyz; http://loan-foru.xyz; http://fastcash-4u.xyz; and http://loans-for-u.site. *See id.* at ¶¶ 12-13. Ostensibly, the purpose of these text messages was to again obtain dubious consent to receive telemarketing messages from other marketing partners and sell leads to even more unrelated entities.

In light of this intervening change in law, Plaintiff submits that the Court should either (1) reconsider its order granting Defendant's motion to dismiss for lack of standing; or (2) permit Plaintiff to file an amended complaint to directly address the changed landscape regarding Article III standing.

---

[1] To be sure, on August 1, 2023, following conferral between the parties, counsel for Defendant confirmed that it did not consent to Plaintiff filing an amended complaint.

9

## II. Defendant Improperly Raised *Critical* Arguments for the First Time in its Reply.

As Plaintiff explained through her response in opposition to Defendant's second amended motion to dismiss, Defendant omitted any argument or briefing related to Plaintiff's core harm-related allegations through its motion to dismiss, reserving materially all direct attacks for its reply. *See* ECF No. 26 at 12-13. Specifically, Plaintiff alleged that, because Defendant concealed its identity when it delivered text messages predicated on *lies*—that Plaintiff applied for a loan (she did not), and was likely approved for a loan (she was not), *see* ECF No. 4 at ¶¶ 12-13—she wasted time "attempting to identify the entity responsible for sending the text messages at issue as well as additional time investigating ways to get Defendant to stop delivering the text messages." *Id.* at ¶ 63.

Defendant, through its reply, acknowledged that it failed to address those allegations—although, in doing so, obliquely blamed Plaintiff for including those allegations in the last two paragraphs of her complaint, *see* ECF No. 28 at 6—and proceeded to attack Plaintiff's allegations by suggesting that she did not waste *enough* time to evade *Salcedo*'s holding. *See id.* at 7. However, the Court should not have credited Defendant's arguments, as those were all raised for the first time in its reply, thereby depriving Plaintiff of the opportunity to adequately respond to them. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we

repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.").

Against that backdrop, given that Defendant's first credible attack at Plaintiff's standing-related allegations arose through its reply, it is significant that Defendant asserted that Plaintiff submitted prior express consent to be contacted for the subject messages through an untested party declaration, but nowhere did Defendant provide proof of prior express *written* consent, as required by the TCPA's implementing regulations and requirements. The FCC, through its 2012 report, "heightened the consent requirement for certain automated telemarketing calls, requiring a TCPA caller to obtain prior express written consent, as opposed to the statutorily required prior express consent." *Coleman v. Rite Aid of Ga., Inc.*, 284 F. Supp. 3d 1343, 1347 (N.D. Ga. 2018). Specifically, the FCC required that:

> a consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." Finally, should any question about the consent arise, the seller will bear the burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained.

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 (2012). Nowhere in Defendant's motion, nor its supporting declaration or reply, did Defendant provide proof of Plaintiff's submission of prior express *written* consent, as required by the TCPA. *See Spinelli v. Storm Tight Windows*, No. 18-62592-CIV-DIMITROULEAS, 2019 U.S. Dist. LEXIS 27573, at *10 (S.D. Fla. Feb. 21, 2019) (noting that "[u]nder 47 U.S.C. § 227(c) and the related regulations" a calling party must obtain the "the residential telephone subscriber's prior express *written* consent.") (emphasis added). Thus, although the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case [and] no presumptive truthfulness attaches to plaintiff's allegations," *see* ECF No. 34 at 13, it should not have concluded that Defendant's untested declaration controlled when it did not even satisfy the TCPA's consent requirements, and should not have subsequently credited and analyzed Defendant's standing arguments that Defendant first addressed on reply.

These issues, combined with the changed landscape regarding standing in TCPA matters in the Eleventh Circuit, further supports Plaintiff's motion for reconsideration.

### III. The FCC and FTC have Previewed that that Consent Obtained in Manners Similar to Defendant's Practices May Be Invalid.

#### A. The FCC Issued a Notice of Proposed Rulemaking Potentially Prohibiting the Farming of Telemarketing Consent in Manners Similar to Those Used by Defendant.

Also relevant, then, is that following the parties' briefing on Defendant's second amended motion to dismiss, on March 17, 2023, the FCC issued a notice of proposed rulemaking regarding new standards applying to "lead generators" such as Defendant, proposing "to ban the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers on subjects beyond the scope of the original consent." Ex. A at ¶ 58. As an illustrative example, the FCC identified instances in which websites purporting to offer comparison shopping for insurance instead sought consent for numerous other "partner companies" to call and text consumers regarding matters unrelated to insurance, based on an extensive list of partner companies nested within a web page hyperlink. *Id.* at ¶ 59.

Plaintiff's allegations against Defendant represent a materially identical set of facts. Here, Defendant alleges that it obtained consent from Plaintiff via a series of supposed 5 a.m. submissions to the "renttoownhomefinder.com" website, which Defendant contends is ostensibly related to "real estate investments." *See* ECF No. 25 at 6. In doing so, Defendant presented similar consent language to that attacked

13

by the FTC in Viceroy, listing some 58 total "partners" on its consent page. *Compare* ECF No. 25-1 at ¶ 6 (providing the consent language); *with* Ex. B at ¶ 25. Those partners include a host of unrelated entities to "real estate investments," such as numerous lending platforms, credit repair organizations, auto insurance providers, tax companies, and even companies seeking to identify Uber and Lyft drivers. *See* ECF No. 27-1. And, of course, the subject messages at issue here came from one of these unrelated partners that had nothing to do with "rent to own" real estate opportunities: Plaintiff alleges—and Defendant did not rebut—that the messages were *lies* suggesting that Plaintiff had applied for, and likely qualified for, loans. ECF No. 4 at ¶ 12; ECF No. 25 at 6 n.3. This is precisely the sort of situation contemplated by the FCC's Notice.

Given that the FCC is contemplating potentially forbidding the gathering of consent in the manner that Defendant states that it did here, the Court should not wholly adopt Defendant's argument that Plaintiff was not harmed by Defendant's text messages in a manner sufficient to satisfy Article III standing requirements. Plaintiff alleges that she did not know who Defendant was or how it claims to have obtained consent to contact her, and that Defendant claims to have obtained its consent to contact Plaintiff regarding fake loan applications through a voluminous list of entities offering unrelated services on a real estate website, which would have

been prevented had Defendant complied with its disclosure requirements under the TCPA. Plaintiff's allegations regarding these brazen violations of 47 C.F.R. § 64.1200(d)(4) thus fall squarely within the harm that the TCPA and it implementing regulations sought to prevent, and as the FCC seeks to potentially prohibit. Given as much, the Court should not conclude, *as a matter of law and absent a fully developed record*, that Defendant's violations of 47 C.F.R. § 64.1200(d)(4) did not cause Plaintiff a concrete harm, particularly given the Eleventh Circuit's expansive reinterpretation of Article III standing in the TCPA context in *Drazen*.

### B. The FTC is Engaging in Enforcement Actions Against "Consent Farm" Websites Analogous to Defendant's.

Lastly, the FTC is beginning to take enforcement action that mirrors the FCC's position on lead generators and aggregate gathering of telemarketing consent. For example, in Viceroy, on July 14, 2023, the FTC alleged that the defendants operated a "consent farm" business, through which those defendants misleadingly operated websites that "failed to clearly disclose that consumers were consenting to receive robocalls, instead leading consumers to believe that they were providing their personal information in order to access job posting." Ex. B at 3. Through that complaint, the FTC alleged that the defendants operated websites that, for example, advertised job postings but, as a condition precedent to obtaining any information, required that users agree to be contacted by a list of approximately 90 "partners,"

15

disclosed via an underlined hyperlink word. *Id.* at ¶¶ 33, 36. Many of those partners offered products or services that were unrelated to the website's purpose. *See id.* at ¶ 43.

As explained *supra* Argument § III.A, Plaintiff alleged a materially identical set of facts here. As a result, concluding, as a matter of law, that Plaintiff validly provided consent to these unrelated third parties, offering services unrelated to the website Defendant claims to have obtained Plaintiff's consent from, such that her subsequent confusion about its false representations about loan applications and approval fails to constitute a concrete harm, would be an inappropriate and premature factual determination absent the completion of discovery. Given that the FTC believes that similar conduct by other "lead generation" websites violates the Federal Trade Commission Act and the Telemarketing Sales Rule, the Court should not rule, as a matter of law, that Plaintiff lacks standing to pursue her claim against Defendant. *See generally* Ex. B.

## Conclusion

Because the Eleventh Circuit reversed *Salcedo*, a ruling critical to Defendant's challenge to Plaintiff's Article III standing, and for all the other reasons discussed herein, the Court should reconsider its prior ruling dismissing Plaintiff's claims for lack of Article III standing, and either deny Defendant's motion to dismiss, or afford

Plaintiff an opportunity to file an amended complaint to remedy any remaining deficiencies and comport her allegations with the current guidance of the Eleventh Circuit.

Date: August 2, 2023            /s/ Rachel Berlin Benjamin
                                Rachel Berlin Benjamin
                                Georgia Bar No. 707419
                                rachel@beal.law
                                Brian J. Sutherland
                                Georgia Bar No. 105408
                                brian@beal.law
                                945 East Paces Ferry Road NE,
                                Suite 2000
                                Atlanta, GA 30326
                                Telephone: (404) 476-5305

                                Alex D. Kruzyk (*pro hac vice*)
                                **PARDELL, KRUZYK & GIRIBALDO, PLLC**
                                501 Congress Avenue, Suite 150
                                Austin, Texas 78701
                                Tele: (561) 726-8444
                                akruzyk@pkglegal.com
                                *Counsel for Plaintiff and the proposed class*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2023, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

                                */s/ Alex D. Kruzyk*
                                Alex D. Kruzyk

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared with Times New Roman 14-point font, in compliance with Local Rule 5.1(c).

*/s/ Rachel Berlin Benjamin*
Rachel Berlin Benjamin
